1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   STORMWATER SYSTEMS, INC., dba          No. 2:14-cv-02472-MCE-CKD
     SAFE DRAIN, INC., a California
12   corporation; JOHN DEMING, an
     individual; and SAFE DRAIN
13   INTERNATIONAL INC., a Nevada           **MEMORANDUM AND ORDER**
     corporation,
14
                    Plaintiffs,
15
              v.
16
     DOUGLAS REITMEYER, an individual;
17   MICHAEL BRASBERGER, SR., an
     individual; and ASHMB, LLC, a Texas
18   Limited Liability Company,

19                  Defendants.

20

21         On October 21, 2014, Stormwater Systems, Inc. ("Stormwater") filed a complaint

22   against Douglas Reitmeyer ("Reitmeyer").  ECF No. 1.  Thereafter, on November 12,

23   2014, Plaintiffs Stormwater dba Safe Drain, Inc. ("Safe Drain"); John Deming ("Deming");

24   and Safe Drain International, Inc. ("International") (collectively "Plaintiffs") filed the

25   operative First Amended Complaint ("FAC") against Reitmeyer; Michael Brasberger, Sr.

26   ("Brasberger, Sr."); Michael Brasberger, Jr. ("Brasberger, Jr."); and the Brasbergers'

27   company ASHMB, LLC ("ASHMB") (collectively "Defendants").  ECF No. 5.  The Clerk of

28   the Court entered default against the Brasbergers and ASHMB on January 14, 2015.

                                          1

1      Currently before the Court are the Brasberger Defendants' Motion to Quash

2  Service of Process and Set Aside Default (ECF No. 41); Reitmeyer's Motion to Dismiss

3  for Improper Venue, Lack of Personal Jurisdiction, or in the Alternative, to Transfer

4  Venue (ECF No.31); and Plaintiffs' Motion for a Preliminary Injunction (ECF No. 34).  For

5  the following reasons, the Brasberger Defendants' Motion to Quash is GRANTED as to

6  Brasberger, Sr. and DENIED as to Brasberger, Jr. and ASHMB; the Motion to Set Aside

7  Default  brought by Brasberger Jr. and ASHMB (ECF No. 41) is DENIED; and

8  Reitmeyer's Motion to Dismiss and Plaintiffs' Motion for Preliminary Injunction are

9  DENIED.  Finally, this case is STAYED pending the parties' participation in a settlement

10  conference.

11

12                          **BACKGROUND**

13      **A.  Factual History[1]**

14      Deming has conducted business as Safe Drain, using the domain

15  <safedrain.com>, since approximately 2000, selling storm drain catch basins ("drains")

16  that capture pollutants and contaminants before they can enter the sewer system.  In

17  late 2013, Deming and Reitmeyer formed International, a Nevada corporation, to sell the

18  drains through ten regional offices that were intended to correspond with regional

19  divisions established by the Environmental Protection Agency ("EPA").  Each regional

20  office was to be run by a regional sales director, who would earn 60% of the profits

21  generated by drain sales.  Safe Drain was to receive the remaining profits.  Brasberger,

22  Sr. and Brasberger, Jr. are regional sales directors of two regional offices.  In addition,

23  the Brasbergers sit on the board of directors of International along with non-defendant

24  Benjamin "Buzz" Holmes ("Holmes"), another regional sales director.

25      According to Defendants, at the first meeting of International shareholders it was

26

27

28

---

[1] The facts are heavily disputed.  The following recitation was compiled from the stream of filings and declarations the parties have submitted to the Court.

[2] Reitmeyer produced an unsigned copy of this shareholder agreement, which Deming claimed he had never seen before.  However, Reitmeyer also produced an earlier signed handwritten agreement

1    agreed that Deming would be allotted 45% of the company, Reitmeyer 45%, Holmes

2    1%, and the Brasbergers 1%.  However, Defendants have been unable to produce a

3    signed record of the 45% split with Reitmeyer,[2] although they were able to produce

4    meeting minutes signed by Deming granting the Brasbergers' a 1% interest in the

5    corporation.  In reply, Deming states that the Brasbergers never actually became

6    shareholders because the shares were never distributed.  Defendants also state that at

7    the initial International meeting, it was agreed that Deming would transfer all ownership

8    of patents, trademarks, and all other assets of Safe Drain to International.  Deming

9    argues that the parties were never able to come to an agreement about ownership over

10   this intellectual property.

11       By mid-2014, business relations between Deming and Reitmeyer had started to

12   deteriorate.  Plaintiffs allege that at an early July 2014 meeting, Deming and others,

13   including Brasberger, Sr., confronted Reitmeyer about his alleged misuse of corporate

14   funds.  Also during that time, Plaintiffs learned that, in approximately January 2014,

15   Reitmeyer had transferred the <safedrain.com> domain into his own name.  Reitmeyer

16   threatened to keep the domain until he "got what he wanted."

17       On July 20, 2014, Deming took steps to rectify this alleged malfeasance by writing

18   to the domain agent, GoDaddy, and explaining that the domain name at issue had been

19   taken illegally.  GoDaddy was nonetheless unable to assist Deming due to the passage

20   of time since the domain was transferred.

21       Soon after, Deming, Brasberger, Sr., and Holmes incorporated a new company

22   called Safe Drain International Delaware ("Delaware corporation") to sell drains without

23   Reitmeyer's interference.   The three men comprised  the board of directors.  According

24   to the Brasbergers, Deming again promised to transfer intellectual property, this time to

25   the newly formed Delaware corporation.  Deming claims, as he did with respect to the

26   _____

27   [2] Reitmeyer produced an unsigned copy of this shareholder agreement, which Deming claimed he had never seen before.  However, Reitmeyer also produced an earlier signed handwritten agreement which purports to split International "50-50" between Deming and Reitmeyer. In response to that document, Deming claims that Reitmeyer's share was contingent on Reitmeyer dedicating all of his time to International, which he failed to do.

28

3

1  Nevada corporation, that the intellectual property was never transferred because the

2  parties could not come to an agreement.

3      The Brasbergers contend that the Delaware corporation was initially capitalized

4  with $100,000 from Brasbergers and Holmes and that, in exchange for capitalizing the

5  new corporation, the Brasbergers were given shares of the new entity and were

6  promised additional sales regions.  Deming disputes that the Brasbergers ever paid their

7  $50,000 share.

8      In September, the Delaware corporation board members began developing plans

9  to sue Reitmeyer in order to gain control of the <safedrain.com> domain.  The

10 Brasbergers went so far as to pay a retainer to International's attorney, Lawrence

11 Townsend, for that purpose.[3]

12     Shortly after the formation of the Delaware corporation, Deming's relationship with

13 the Brasbergers also began to sour.  Indeed, by October 2, 2014, and in some instances

14 much earlier, Plaintiffs allege Deming learned that Brasberger, Jr.: (1) had terminated

15 Deming's administrative rights to the Customer Relationship Management System

16 ("CRM"), which eliminated  Deming's ability to control marketing, customer service, and

17 sales of the company's extensive customer base; (2) was preventing Deming from

18 accessing contacts and leads in the CRM systems during the preceding months; (3) took

19 control of the website and substituted his personal contact information for all but two of

20 the ten EPA regions, including Deming's region; and (4) altered the site so all leads

21 would be sent to Brasberger, Jr. alone.

22     In response, the Brasbergers claim that in the first few months after the Delaware

23 corporation was formed, the new company's debts were quickly mounting, its cash was

24 being squandered on Deming's personal expenses, customers were being neglected, a

25 toll free number controlled by Deming was seldom answered, and business opportunities

26     [3] Lawrence Townsend filed the initial complaint against Reitmeyer in this action approximately one
month later.  That complaint was later amended to include the Brasbergers and their company as
27 defendants.  In what may be a serious conflict of interest, Lawrence Townsend is still listed as counsel for
Plaintiffs after, based on the facts before the Court, having sued his own clients, the Brasberger
28 Defendants.

1   were dwindling.  During October, the Brasbergers claim they discovered that Plaintiff

2   Deming had removed their contact information from the website, emptied the corporate

3   bank accounts for his personal use, and had started taking work designated for other

4   regions for himself.  According to the Brasbergers, Deming has no rights to the CRM

5   system because the Brasbergers created the CRM system and paid for a ten-year

6   license for use by their regional distribution business, not International.  Deming

7   counters this assertion by alleging that any payments on the CRM system were made on

8   behalf of International and were noted as such in the corporate accounting.  Deming

9   further contends that the CRM system is populated with information on Safe Drain

10   customers, which belongs to Deming and Safe Drain, not the Brasbergers.

11       On October 4, 2014, Deming met with Brasberger, Sr. and Holmes in an attempt

12   to resolve their issues related to the control of the business.  Deming asserts that at the

13   meeting the parties agreed that Defendants would release all control of accounting, the

14   CRM system, the domain and website, and all other facets of corporate operations on

15   October 6, 2014.[4]  Sometime in October, although it is unclear whether it was at this

16   meeting, the Brasbergers claim that Buzz Holmes and Brasberger, Sr. told Deming they

17   wanted to manufacture and distribute Safe Drain products individually and pay a royalty

18   on patented products.

19       According to Plaintiffs, October 6th came and went, and Defendants did not

20   perform their end of the bargain.  Rather, they refused to return control of the website,

21   domain, CRM system, and accounting, terminated Plaintiffs' control over the business'

22   Facebook page and changed all contact information contained therein.  In addition,

23   Plaintiffs allege that beginning in mid-October, Defendants began telling third parties that

24   Deming was unable to pay his bills, had not filed corporate tax returns, and that Safe

25   Drain was a defunct corporation.

26       For their part, the Brasbergers have produced a board resolution from a Safe

27       [4] Plaintiffs also claim that this meeting resulted in Defendants strong arming Deming into signing
28   an agreement, a copy of which has still not been provided to the Court, without giving him adequate time
    to read it or consult with a lawyer.

1   Drain International Delaware board meeting on October 17, 2014, signed by Brasberger,

2   Sr. as the "Secretary," that directly contradicts the above allegations.  In that resolution,

3   the board votes to put Brasberger, Jr. in charge of the Web Site, CRM, and LinkedIn

4   accounts until a settlement could be reached between the board members.  The board

5   also voted to dissolve the corporation.

6        On October 19, 2014, Reitmeyer allegedly contacted Palm Tree, the

7   <safedrain.com> website manager, and indicated he owned and controlled the domain

8   for the protection of himself and other investors.  Additionally, Deming alleges that on

9   this date Defendants took control of all <safedrain.com> emails, including Deming's

10  personal account, and began sending emails to customers while posing as Deming.

11       In his defense, Reitmeyer has presented an email from January 2014 showing

12  that Deming voluntarily transferred the domain name to him and states that the transfer

13  was done because Deming was worried about his creditors seizing that name.

14  Reitmeyer also states that he gave control of the website to Brasberger, Jr. because

15  Deming was not distributing the leads fairly, and Reitmeyer thought that Brasberger, Jr.

16  was better suited to do so.

17       The websites <safedrain.com> and <safedrain.net> both now list Brasberger, Jr.

18  as the only contact for the company.  Deming created a new website,

19  <safedrainusa.com>, but claims that customers are not finding this new site.  Reitmeyer

20  argues that Brasberger, Jr. has been sending leads from Deming's region to Deming.

21  The Brasbergers also claim that Deming does not own any of the patents for Safe Drain

22  products and that the patents may now be part of the public domain due to Deming's

23  failure to pay maintenance fees.

24       On October 30, 2014, Deming received an email from a supplier informing

25  Deming that Brasberger, Jr. had warned the supplier not to ship Safe Drain products to

26  Deming without first receiving payment.  That same day, Deming received an email from

27  a customer located in California asking for an update on an order.  Deming had not been

28  able to contact this customer earlier given his lack of access to his safedrain.com email.

1    In mid-December, Reitmeyer's son, Sean, began forwarding Deming's

2    safedrain.com emails to Deming's gmail account.  However, Plaintiffs argue that

3    Defendants still maintain the ability to read and respond to Deming's emails.  In addition,

4    when his emails were forwarded, Deming noticed that the password on his Dropbox

5    account had been changed.  He was able to reset the password, but then discovered

6    that his entire Dropbox account (which included both personal and professional

7    documents) had been copied.  Based on the name of the device to which it was

8    copied—"SeanCooler"—he believes that the culprit was Sean Reitmeyer.  During this

9    same period, someone also allegedly attempted to reset Deming's Apple ID.

10   Subsequently, on January 29, 2015, Deming received a check from a customer

11   located in Oklahoma.  According to Plaintiffs, International's standard practice had been

12   for regional owners to first enter into contracts with customers and to then order parts

13   from Deming's California company—Safe Drain.  Safe Drain would then ship the parts to

14   the customer, receive the payment, and write a check to the regional distributor for its

15   share of the profit.  Based on the invoice received from the Oklahoma company, Deming

16   believes that the Brasbergers were able to ship parts to the company without contacting

17   Safe Drain, which led him to believe that the Brasbergers were manufacturing their own

18   Safe Drain products.  Deming also later received checks from two more customers, one

19   of which was located in California (Deming's sales region), showing that more orders

20   had been filled without authorized Safe Drain products.  The California check also

21   purportedly evidences that not all leads from Deming's region were being forwarded to

22   him by Brasberger, Jr., despite Brasberger, Jr.'s claims to the contrary.

23       **B.  Procedural History**

24   On October 21, 2014, Plaintiffs filed a complaint against Reitmeyer.  ECF No. 1.

25   Thereafter, on November 12, 2014, Plaintiffs filed the operative FAC adding Brasberger,

26   Sr., Brasberger, Jr., and the Brasbergers' company ASHMB, as Defendants.  ECF No. 5.

27   Shortly thereafter, ASHMB filed an action against Deming in Texas state court,

28   alleging that the distribution agreements signed by the Brasbergers were procured by

1  fraud, that Deming did not own the Safe Drain trademark or patents, and that Deming

2  was acting to decrease or destroy the value of the Safe Drain business that the

3  Brasbergers had purchased from him.

4      On November 20, 2014, thirty days after the filing of the initial complaint and eight

5  days after they filed the FAC, Plaintiffs filed an Application for a Temporary Restraining

6  Order.  The Application was opposed by Reitmeyer, but the Court did not hear from the

7  Brasberger Defendants, who had yet to be properly served.   The Application was

8  denied on November 25, 2014.  ECF No. 19.

9      On December 9, 2014, Plaintiffs mailed via certified mail the copy of summons

10  and the complaint to Brasberger, Jr. (as an individual defendant and as the designated

11  agent for service of process for Defendant ASHMB.) and Brasberger, Sr.  Brasberger,

12  Sr.'s mail was returned as "unclaimed" by the post office and the return receipt was

13  unsigned.  Brasberger, Jr.'s letter, on the other hand, was returned as "refused," and his

14  receipt was signed.

15      On January 6, 2015, Reitmeyer filed a Motion to Dismiss for Improper Venue,

16  Lack of Personal Jurisdiction, or in the Alternative, Motion to Transfer Venue.  Reitmeyer

17  requested that the Court dismiss the case or transfer the case to the Western District of

18  Texas.  ECF No. 29.

19      None of the Brasberger Defendants responded to the FAC, and on January 8,

20  2015, Plaintiffs requested an entry of default as to ASHMB, Brasberger, Jr., and

21  Brasberger, Sr. ECF No. 33.  The Clerk of the Court entered the defaults of those parties

22  on January 14, 2015.  ECF No. 35.

23      Almost two weeks later, on January 26, 2015, the Court received from the

24  defaulted Brasbergers a Motion to Quash Service of Process and Set Aside Default

25  (ECF No. 41) and a Request to Continue the hearing on the Preliminary Injunction

26  Motion until after the Motion to Quash could be heard (ECF No. 42).  The Court denied

27  the Request to Continue and stated that the Motion to Quash would be heard at the

28  outset of the Preliminary Injunction Motion hearing on February 5th and, if the default

1   was set aside, that the Brasbergers could participate in the subsequent preliminary

2   injunction hearing and submit follow-up briefing to the Court.  ECF No. 44.  The Court

3   held two hearings on the pending motions.

4           First, on February 5, 2015, counsel for all parties appeared before the Court.[5]

5   With respect to Brasberger, Sr.'s Motion to Quash, the Court determined he had not

6   been properly served.  ECF No. 52.   The Court found to the contrary, however, with

7   respect to Brasberger, Jr., who the Court concluded had been served when he signed

8   the return receipt for a certified mailing containing the summons and the complaint and

9   returned the mailing marked "refused."  The Court was unpersuaded by Brasberger, Jr.'s

10  argument that his signature had been forged.  Furthermore, since Brasberger, Jr., is

11  ASHMB's registered agent for service of process, ASHMB, had been served as well.

12  The Court then ordered Brasberger, Jr. to appear at a subsequent evidentiary hearing to

13  determine whether his default, and consequently ASHMB's default, should be set aside.

14  ECF No. 52.  The Court also advised the parties it would deny Reitmeyer's Motion to

15  Dismiss, but that a further order would follow.  Finally, the Court permitted additional

16  briefing on the request for preliminary injunctive relief.

17          Second, on February 19, 2015, the Court conducted an evidentiary hearing.  Just

18  prior to the hearing, Brasberger, Jr. filed a declaration with the Court stating that his mail

19  carrier had signed the certified mail return receipt and returned the mailing containing

20  the summons and complaint.  After hearing testimony and considering the entire record,

21  the Court declined to set aside the default that had been entered by the Court Clerk as

22  to Brasberger, Jr. and ASHMB.[6]  See ECF Nos. 35, 59. The Court took the Motion for

23  Preliminary Injunction under submission.  This Memorandum and Order serves as the

24  _____

25          [5] Reitmeyer's counsel had also filed a Motion to Withdraw, which was granted at that hearing.
    See ECF Nos. 47, 52.

26          [6] The Brasberger Defendants filed a Motion for Reconsideration of Order Denying Defendants'
27  Motion to Quash Service of Process, ECF No. 56, which was denied as moot at the February 19, 2015,
    evidentiary hearing because no formal order had been issued on the Motion to Quash Service and Set
28  Aside Default.  ECF No. 59.

1    Court's formal ruling on all pending matters.[7]

2    **BRASBERGER DEFENDANTS' MOTION TO QUASH SERVICE AND SET ASIDE**
3    **DEFAULT**

4         Service may be effectuated by sending a copy of the summons and complaint to

5    the defendant by first-class mail, postage prepaid, and requiring a return receipt.  Cal.

6    Civ. Proc. Code § 415.40.  Service of summons in this manner is deemed complete on

7    the 10th day after such mailing.  Id.  If service is made by mail pursuant to section

8    415.40, a plaintiff must prove service on an out-of-state defendant with "evidence

9    satisfactory to the court establishing actual delivery to the person to be served, by a

10   signed receipt or other evidence."  Id. § 417.20(a) (emphasis added).

11        The crux of the parties' service-related dispute turns on whether there is adequate

12   evidence to show actual delivery on the Brasbergers.  Both Brasbergers argue that

13   service was ineffective because they never signed the return receipt.  See Stamps v.

14   Superior Court, 14 Cal. App. 3d 108, 110 (1971) (finding that a return receipt marked

15   "unclaimed" did not suffice as valid proof).  This argument is persuasive only as to

16   Brasberger, Sr.

17        **A.    Brasberger, Sr.**

18        Brasberger, Sr. received notice from the post office that there was a certified letter

19   for him and he left it unclaimed.  In addition, Plaintiffs had emailed Brasberger, Sr. twice

20   about the litigation and had attempted to serve him by personal service.  The process

21   server went to Brasberger, Sr.'s residence a total of seven times.  On his second

22   attempt, the process server spoke with Brasberger, Sr.'s wife, who told him that

23   Brasberger, Sr. was out of town.  The door was never opened on the subsequent five

24   tries.

25        Counsel for Plaintiffs would like the Court to find that service was effectuated

26   under these circumstances because Plaintiffs did everything in their power to serve

27   _____
          [7] Should any conflict appear to exist between the Court's statements on the record in open court
28   and those statements set forth here, this written order controls.

1   Brasberger, Sr. but he intentionally avoided service.  Plaintiffs rely primarily on <u>Hankla v.</u>

2   <u>Governing Bd. of Roseland School Dist.</u>, 46 Cal. App. 3d 644, 655 (1975), where the

3   court held that "[a] person may not deny personal service on the grounds of lack of

4   delivery where the delivery was deliberately prevented by the action of the person to be

5   served."  However, that case involved a notice filed under the education code and not a

6   summons in a civil case.

7        Plaintiffs also point to Ninth Circuit case law stating that "[s]ufficient service may

8   be found where there is a good faith effort to comply with the requirements of Rule

9   4(e)(2) . . . and further compliance with Rule 4(e)(2) is only prevented by the defendant's

10  knowing and intentional actions to evade service."  <u>Travelers Cas. & Sur. Co. of Am. v.</u>

11  <u>Brenneke</u>, 551 F.3d 1132, 1136 (9th Cir. 2009).  Yet the holding in <u>Travelers</u> and other

12  similar Ninth Circuit cases have thus far been limited to situations where the process

13  server was in the presence of the defendant and then left the summons and complaint in

14  close proximity to the defendant.  That is not the case here.  Brasberger Sr. had notice

15  of the complaint and summons, but the documents remained at the post office and were

16  never in his presence.

17       While it may seem ostensibly sound to find that service has been accomplished

18  where plaintiffs have made multiple efforts to serve, the defendant had notice, and the

19  defendant intentionally evaded service, neither California nor Ninth Circuit case law

20  supports that position.  Therefore, the Court finds that Brasberger, Sr. was never served

21  and the default should be set aside as to Brasberger, Sr.

22       **B.    Brasberger, Jr. & ASHMB**

23       Brasberger, Jr.'s argument is different.  In contrast to his father, Plaintiffs have

24  submitted proof that Brasberger, Jr. did sign the return receipt before sending the

25  mailing back marked "refused."[8]  More specifically, the return receipt was signed with a

---

26  [8] According to the Postal Service's website, the official process for certified mail with a requested

27  return receipt is as follows:  If you are mailing to a residential address and no one is home, a delivery slip
    is to be left in the mailbox by the letter carrier. This informs the resident a USPS Certified Mail letter is
    being held at the local Post Office for pick-up.  They can go to the Post Office to pick up the letter.  If no

28  one picks up the letter after 7 days, USPS attempts a second delivery.  Again USPS will leave behind a

1  signature bearing a striking resemblance to Brasberger, Jr.'s own signature and his

2  name was written below the mark.  Brasberger, Jr. has nonetheless concocted a variety

3  of excuses as to how this could have happened.  First, Brasberger, Jr. claimed that the

4  signature must have been forged by Plaintiffs' counsel or someone at Plaintiffs'

5  counsel's firm.  The Court rejected this explanation at the February 5, 2015, hearing and

6  ordered Brasberger, Jr. to personally appear for an evidentiary hearing.

7      Then, in a declaration received prior to the evidentiary hearing, Brasberger, Jr.

8  changed his story, claiming instead that it was his mail carrier who had signed

9  Brasberger Jr.'s name to the return receipt, written his name beneath the signature, and

10  then sent the letter back marked "refused" on his behalf.  Brasberger, Jr. included

11  declarations from both his Texas attorney and the purported mail carrier confirming his

12  new story.  ECF No. 56.  Notably absent from these declarations, however, was any

13  explanation as to why the mail carrier would have jeopardized her career or risked

14  criminal prosecution by sending Brasberger, Jr.'s mail back.  Nor was Brasberger, Jr.

15  able to shed any light on the mail carrier's possible motivations at the evidentiary

16  hearing.

17      Indeed, Brasberger, Jr.'s testimony at the evidentiary hearing made no sense.

18  According to Brasberger, Jr., on February 5, 2015, the day of the first hearing, he was

19  raking leaves when he saw his mail carrier, Rhonda Pitts.  He had never met or spoken

20  to Ms. Pitts before.  He asked her if she remembered a piece of certified mail that was

21  sent to him in December.  She said that she thought that she had delivered it and lost

22  the slip, so she put dashes or lines on the signature line of the return receipt.  The

23  conversation lasted for approximately one to one-and-a-half minutes.  The next morning,

24  Brasberger, Jr. went to the post office hoping to speak with someone.  Apparently, he

25  fortuitously ran into Ms. Pitts,  who clarified that she thought that she lost the "brown

26

27  delivery slip reminder in the mail box.  After the final notice reminder is left the letter is taken back to the
   Post Office and held for 5 to 7 additional days.  This entire time frame can take 17 to 21 days.  If no one
   claims the letter USPS will mark the letter 'Unclaimed' and the letter is returned to the sender.

28

1    card" that notifies the recipient that a letter is being held on their behalf at the post office.

2    Brasberger, Jr.'s stories are entirely incredible.  The Court had the benefit of

3    listening to Brasberger, Jr. testify for more than an hour.  The Court was able to observe

4    his demeanor, including the way he presented himself and the inflection in his voice, and

5    make its own credibility determination.  Based on Brasberger Jr.'s complete lack of

6    credibility, the Court gives no weight to the relevant portions of his testimony.  It is

7    entirely possible, and in the Court's opinion likely, that both Ms. Pitts and Brasberger, Jr.

8    have committed perjury.  Regardless, Ms. Pitts has voluntarily implicated herself in two

9    potential federal offenses, and the Court has thus ordered an investigation by the United

10   States Postal Inspector.[9]   That said, given the signature card and other evidence

11   produced by Plaintiffs, and Brasberger, Jr.'s complete lack of credibility, the Court finds

12   that Brasberger, Jr. was served.  The Court next addresses Brasberger Jr.'s argument

13   that the default should be set aside.

14   "The court may set aside entry of default by the Clerk of the Court for good

15   cause shown."  Fed. R. Civ. P. 55(c).  Three factors are relevant to this determination:

16   (1) whether the defendant's culpable conduct led to the default; (2) whether the

17   defendant has a meritorious defense; and (3) whether setting aside default would

18   prejudice the plaintiff.  See TCI Grp. Life Ins. Plan v. Knoebber, 244 F.3d 691, 696 (9th

19   Cir. 2001).  These factors are disjunctive, and "a finding that any one . . . is true is

20   sufficient reason for the district court to refuse to set aside the default."  United States v.

21   Signed Personal Check No. 730 of Yubran S. Mesle, 615 F.3d 1085, 1091 (9th Cir.

22   2010).  The party seeking to set aside the default bears the burden of demonstrating that

23   there is good cause to do so.  Franchise Holding II, LLC. v. Huntington Rests. Grp., Inc.,

24   375 F.3d 922, 926 (9th Cir. 2004).

25   Brasberger Jr.'s culpable conduct is enough to justify the Court's refusal to set

26

27   _____
         [9] Specifically, "Delay or Destruction of Mail or Newspapers" under 18 U.S.C. § 1703 and
28   "Obstruction of Mails Generally" under 18 U.S.C. § 1701.

1    aside his default here.[10]  "[A] defendant's conduct is culpable if he has received actual or

2    constructive notice of the filing of the action and intentionally failed to answer." TCI Grp.,

3    244 F.3d at 697.  Typically, a defendant's conduct is culpable where there is no

4    explanation other than a devious, deliberate, willful, or bad faith failure to respond. Id. at

5    698.  In order to qualify as culpable, the defendant must have acted in bad faith, such as

6    by demonstrating an "intention to take advantage of the opposing party, interfere with

7    judicial decisionmaking, or otherwise manipulate the legal process." Id. at 697; see, e.g.,

8    Kingvision Pay–Per–View Ltd. v. Lake Alice Bar, 168 F.3d 347, 350 (9th Cir.1999)

9    (defendant bar owners ignored the summons and complaint despite frequent chats with

10   their lawyers during the period for answer, and filed false affidavits claiming they had not

11   been served); Pena v. Seguros La Comercial, S.A., 770 F.2d 811, 815 (9th Cir. 1985)

12   (defendant insurer had provided its customers and state insurance regulators with an

13   incorrect address, thereby precluding service of process on the company); Alan Neuman

14   Prods., Inc. v. Albright, 862 F.2d 1388, 1390 (9th Cir. 1988) (when served, defendant

15   "did not admit who he was and refused to accept the papers from the process server,

16   who laid them at [his] feet," and then retained counsel to check the docket for a return of

17   service); Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc., 840 F.2d 685,

18   690 (9th Cir.1988) (defendant was "a lawyer, presumably . . . well aware of the dangers

19   of ignoring service of process").

20        Brasberger, Jr. claims that he was unaware of the litigation until the default was

21   entered and that he only read the complaint for the first time on February 2, 2015.  ECF

22   50-1 at 2.  He claims this despite multiple emails from Plaintiffs' counsel, a process

23   server coming to his house and speaking with his daughter, his ongoing relationship with

24   the other Defendant in this case, Douglas Reitmeyer, with whom he spoke or emailed a

25   _____

26   [10] Plaintiffs conceded at the February 5, 2015 hearing that setting aside the default would not
     cause them prejudice.  The Brasbergers identified a potentially meritorious defense on the merits of this
27   matter in their reply brief to the Motion to Quash.  While Plaintiffs argued at the hearing that any such
     defense should have been set forth in the motion itself, the Court was unable to find support for Plaintiffs'
     argument in the case law.  Accordingly, in ruling on the Motion to Quash, the Court's focus must be on
28   Brasberger, Jr.'s culpable conduct.

1    dozen times during November and December of 2014, his concurrent litigation against

2    Deming in Texas state court, and that it was Brasberger, Jr. who initially planned and

3    funded the lawsuit against Reitmeyer, which he knew would proceed in the Eastern

4    District.  It is simply inconceivable under these circumstances that Brasberger, Jr. did not

5    know of this litigation.

6         Accordingly, while default judgments are typically disfavored, such a judgment is

7    nonetheless appropriate here since Brasberger, Jr. has been attempting to manipulate

8    the legal system through misrepresentations that interfered with this Court's decision

9    making process. TCI Grp., 244 F.3d at 698.  Furthermore, Brasberger, Jr. was

10   represented by counsel from late October of 2014 to present, counsel who presumably

11   would have informed Brasberger, Jr. of the possible consequences of avoiding service

12   and filing false declarations.  Kingvision Pay–Per–View, 168 F.3d at 350.  Therefore, the

13   Court denies the request to set aside the default as to Brasberger, Jr. and ASHMB.

14

15   **REITMEYER'S MOTION TO DISMISS FOR IMPROPER VENUE, LACK OF
     PERSONAL JURISDICTION, OR IN THE ALTERNATIVE, TO TRANSFER VENUE**

16

17        Defendant Reitmeyer moves to dismiss for lack of personal jurisdiction.[11]  "The

18   question of personal jurisdiction, which goes to the court's power to exercise control over

19   the parties, is typically decided in advance of venue, which is primarily a matter of

20   choosing a convenient forum."  Leroy v. Great W. United Corp., 443 U.S. 173, 180

21   (1979).

22        **A.  Personal Jurisdiction**

23        "In this circuit, [courts] analyze specific jurisdiction according to a three-prong

24   test: (1) the non-resident defendant must purposefully direct his activities or consummate

25   _____

         [11] As a threshold matter, Plaintiffs contend jurisdiction should be found in part because the
26   Brasbergers' actions are attributable to Reitmeyer under an agency theory.  The Court finds that Plaintiffs
     have not presented enough evidence to support their position.  While Reitmeyer seems to be acting in
27   concert with the Brasbergers, there is no formal agency relationship.  At best, the parties are co-
     shareholders and co-directors of a company; the Brasbergers are not employees of Reitmeyer.  Therefore,
28   the Court will only consider the actions of Retimeyer when analyzing jurisdiction.

1   some transaction with the forum or resident thereof; or perform some act by which he

2   purposefully avails himself of the privilege of conducting activities in the forum, thereby

3   invoking the benefits and protections of its laws; (2) the claim must be one which arises

4   out of or relates to the defendant's forum-related activities; and (3) the exercise of

5   jurisdiction must comport with fair play and substantial justice, i.e., it must be

6   reasonable." Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433. F.3d

7   1199, 1205-06 (9th Cir. 2006).[12]

8          As to the first prong, the parties dispute which personal jurisdiction test should be

9   used.  Because the claims against Reitmeyer (cyber piracy, conversion, and trademark

10  infringement) are akin to torts, the "purposeful direction test" outlined by the Supreme

11  Court in Calder v. Jones, 465 U.S. 783 (9184), is appropriate.  Schwarzenegger v. Fred

12  Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004).  In order for the Court to have

13  jurisdiction under that test, the Defendant must have committed an intentional act,

14  expressly aimed at the forum state, causing harm that Defendant knows is likely to be

15  suffered in the forum state.  Id. at 803 (quoting Dole Food Co. v. Watts, 303 F.3d 1104,

16  1111 (9th Cir. 2002)).  "Due process permits the exercise of personal jurisdiction over a

17  defendant who 'purposefully direct[s]' his activities at residents of a forum, even in the

18  'absence of physical contacts' with the forum."  Schwarzenegger, 374 F.3d at 803

19  (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)).

20         This prong is satisfied here because Reitmeyer knew that Deming was a

21  California resident when he purportedly transferred the domain <www.safedrain.com>

22  into his own name and intentionally gave control over the content of the website to

23  Brasberger, Jr.  Dole Food Co., 303 F.3d at 1111 (holding that conduct is expressly

24  aimed "when the defendant is alleged to have engaged in wrongful conduct targeted at a

25  plaintiff whom the defendant knows to be a resident of the forum state") (internal

26

27         [12] There are two types of personal jurisdiction: general and specific.  General jurisdiction only
    exists when a defendant is domiciled in the forum state or his activities there are "substantial" or
    "continuous and systematic."  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16
28  (1984).  Such is not the case here.

1   quotations omitted); see also Panavision Int'l v. Toeppen, 141 F.3d 1316, 1321 (9th Cir.

2   1998) (citing Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414 (9th Cir.1997) for the

3   proposition that in cases involving actions that occur in cyber space, the Court must look

4   at whether "the defendant purposefully (albeit electronically) directed his activity in a

5   substantial way to the forum state").

6          In addition, while the parties dispute Reitmeyer's reasons for orchestrating this

7   transfer, both sides seem to acknowledge, whether rightly or wrongly, that the purpose

8   of Reitmeyer's actions was to reduce the number of business leads going to Deming,

9   causing harm Reitmeyer should have known was likely to be suffered by Deming in

10  California.   The Court finds that this case is analogous to Panavision, where the

11  defendant allegedly used plaintiff's trademark to register a domain name and then

12  concocted a scheme to sell the domain name to the plaintiff.  141 F.3d 1316, 1319.

13  While the plaintiff in that case conducted his operations in Illinois, the court held that the

14  defendant was subject to personal jurisdiction in California because that was where the

15  plaintiff was located and where the harm was felt.  Id. at 1317-19.

16         The second prong is also satisfied. Plaintiffs have to show that "but for"

17  Reitmeyer's forum related activities, their injuries would not have occurred.  Mattel, Inc.

18  v. Greiner & Hausser GmbH, 354 F.3d 857, 864 (9th Cir. 2003).  A single forum state

19  contact can support jurisdiction if the cause of action arises out of that particular

20  purposeful contact.  Yahoo! Inc., 433 F.3d at 1210.  Reitmeyer's single action of

21  transferring the domain name is sufficient because absent that action, Plaintiffs would

22  not have been harmed.

23         As to the final prong, there are seven factors the Court considers to determine if

24  jurisdiction is reasonable and comports with fair play and substantial justice: (1) the

25  extent of Defendant's purposeful interjection into the forum; (2) the burden of defending

26  the suit in the forum; (3) the extent of conflict with the sovereignty of the defendant's

27  state; (4) the forum state's interest in the dispute; (5) the most efficient forum for judicial

28  resolution of the dispute; (6) the importance of the chosen forum to the plaintiff's interest

17

1    in convenient and effective relief; and (7) the existence of an alternative forum.  Bancroft

2    & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1088 (9th Cir. 2000).  "[W]here a

3    defendant who purposefully has directed his activities at forum residents seeks to defeat

4    jurisdiction, he must present a compelling case that the presence of some other

5    considerations would render jurisdiction unreasonable."  Panavision, 141 F.3d at 1322

6    (9th Cir. 1998).  "No one factor is dispositive."  Id. at 1323.

7         Reitmeyer argues that jurisdiction is unreasonable because he had limited

8    contacts with California and is responsible for the care of his disabled son, making it a

9    hardship for him to travel for the trial.  He further contends that Texas would be a more

10   efficient forum given the important role bank records will play in this case.  While there is

11   some merit to Reitmeyer's arguments, on balance, he has not shown that his due

12   process rights would be violated if the action continued in California.  Therefore, the

13   Court may exercise personal jurisdiction over Reitmeyer, and his request for dismissal

14   based on the lack of such jurisdiction is DENIED.

15        **B. Improper Venue**

16        As an alternative to dismissal, Reitmeyer seeks to transfer this matter to the

17   Western District of Texas.  Venue is proper in "a judicial district in which a substantial

18   part of the events or omissions giving rise to the claim occurred, or a substantial part of

19   property that is subject of the action is situated. . . ."  28 U.S.C. § 1391(b).  Plaintiffs bear

20   the burden of showing they have chosen a proper forum.  Koresko v. Realnetworks, Inc.,

21   291 F. Supp. 2d 1157, 1160 (E.D. Cal. 2003).   Where venue is improper, the Court may

22   either dismiss the case under Rule 12(b)(3) or transfer the case in the interests of justice

23   to an appropriate jurisdiction pursuant to 28 U.S.C. § 1406(a).

24        As with the personal jurisdiction analysis, the determination of a proper venue is

25   problematic because Reitmeyer's actions (transferring the domain name to himself and

26   giving Brasberger, Jr. control over the website) occurred in cyberspace.  Deming was

27   injured, however, in California, and in a tort action, the locus of the injury is a relevant

28   factor. Myers v. Bennett Law Offices, 238 F.3d 1068, 1076 (9th Cir. 2001) (holding that

1   venue was proper in Nevada because at least one of the harms suffered by the Plaintiffs

2   was felt in Nevada).  Accordingly, venue in the Eastern District of California is proper

3   because the harm caused by Reitmeyer's conduct was suffered in this district.

4       **C.  Forum Non Conveniens**

5       For similar reasons, the Court declines to transfer the case on forum non

6   conveniens grounds.  The Court is unconvinced that Reitmeyer would suffer a great

7   inconvenience litigating this matter in California.  Assuming Reitmeyer quickly hires

8   substitute California counsel, which he has promised to do, his need to travel to

9   California for this litigation will likely be minimal.

10

11       **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

12

13      Finally, the Court addresses Plaintiffs' request for a preliminary injunction.  A party

14  requesting preliminary injunctive relief must show that "he is likely to succeed on the

15  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

16  the balance of equities tips in his favor, and that an injunction is in the public interest."

17  Winter v. Natural Resources Def. Council, 555 U.S. 7, 20 (2008); Stormans, Inc. v.

18  Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter).

19      Alternatively, under the so-called sliding scale approach, as long as the Plaintiffs

20  demonstrate the requisite likelihood of irreparable harm and show that an injunction is in

21  the public interest, a preliminary injunction can still issue so long as serious questions

22  going to the merits are raised and the balance of hardships tips sharply in Plaintiffs'

23  favor.  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-36 (9th Cir. 2011)

24  (concluding that the "serious questions" version of the sliding scale test for preliminary

25  injunctions remains viable after Winter).

26      In their Application, Plaintiffs ask that the Court order Defendants to:

27          1.  Refrain from interfering in any manner with Safe Drain or
                International's ability to conduct business and control and

28

1

2

3

4

5

6

7

8

9

10

11

12

    access its corporate facets, such as email, website, domain, Facebook page, CRM system, phones.

  2. Refrain from holding funds properly belonging to Plaintiffs;

  3. Refrain from withdrawing or transferring any funds from any account of Plaintiffs;

  4. Refrain from holding property properly belonging to Plaintiffs, including, but not limited to, the domain, demo units, valves, and other items of equipment; sales literature and/or trade show displays;

  5. Refrain from interfering with Plaintiffs' use of proprietary software belonging to Plaintiffs, including, but not limited to, email accounts, CRM software, and Facebook account(s);

  6. Refrain from any and all use of the "Safe Drain" mark, including, but not limited to, advertising, websites, social media, production, sales, and/or solicitations;

  7. Refrain from contacting any vendors of Plaintiffs;

  8. Refrain from harassing or damaging the reputation of Deming or any other staff member of Plaintiffs; and

  9. Refrain from soliciting, communicating, or transacting business with customers and potential customers in Deming's region.

  10. Such other injunctive relief as this Court deems warranted.

13 ECF No. 34-1 at 25.

14    Plaintiffs plainly seek more than to simply preserve the status quo.  Rather, by

15 their requested relief, they seek to alter the parties' positions and business relationships.

16 Such mandatory injunctive requests are subject to heightened scrutiny.  Dahl v. HEM

17 Pharms. Corp., 7 F.3d 1399, 1403 (9th Cir. 1993). Indeed, they are particularly

18 disfavored and will not be granted unless extreme or very serious harm will result.

19 Marlyn Pharms., Inc. v. Mucos, 571 F.3d 873, 879 (9th Cir. 2009).  A court must

20 accordingly be "extremely cautious" about granting such relief.  Martin v. Int'l Olympic

21 Comm., 740 F.2d 670, 675 (9th Cir. 1984).

22    Regardless of the scrutiny applied, however, the Court fails to see how it could

23 enforce the order Plaintiff requests.  Most of the requests involve the phrase "belonging

24 to Plaintiffs" or "of Plaintiffs," but this entire litigation turns on the rights to and ownership

25 of these various items.  Not only do Plaintiffs seek to have the Court make the ownership

26 determination even prior to discovery, that determination may well have to be revisited

27 each time enforcement of the injunction is sought in the future.  Injunctive relief under

28 those circumstances would be impracticable, if not impossible, for this Court to

1    administer.

2         In addition, it is not clear how much harm, if any, Plaintiffs are facing from

3    Reitmeyer's control of the domain name and Brasberger, Jr.'s control of the website,

4    Facebook page, and CRM system.  The Court is not satisfied that any web traffic is

5    failing to find Deming's replacement site—<safedrainusa.com>.  A Google search for

6    "Safe Drain" listed <safedrainusa.com> first and the home webpage of the site

7    prominently says "this is the official safe drain page."  Moreover, the Facebook page is

8    not very active, with 114 likes and only 5 visits.  Its main function seems to be

9    advertising appearances at trade shows, which supports Reitmeyer's claim that most of

10   the International business comes from trade shows and not through the website or

11   Facebook page.  With respect to the CRM system, the Brasbergers have provided

12   evidence that it was used infrequently by Deming and that an alternate system is in

13   place to manage Deming's customers.

14        Finally, any harm suffered by Deming appears to be easily quantifiable economic

15   harm.  Deming's main complaint is that he is not receiving business leads for his region.

16   Any lead taken by the Brasbergers or other regional distributors can be tracked based

17   on the region of the project, the amount of lost profit can be quantified, and Deming can

18   be made whole through damages.  Economic loss does not, in and of itself, constitute

19   irreparable harm.  Sampson v. Murray, 415 U.S. 61, 90 (1974).

20        While this argument would not apply to Deming's claim that he is suffering

21   irreparable reputation harm from Defendants speaking negatively about him to his

22   suppliers and vendors, there is no evidence that this has continued since emails from

23   the Brasbergers and Reitmeyer, as described above, were sent in late 2014.  And even

24   so, it would be difficult for the Court to prevent this possible harm with an injunction.  The

25   Court cannot prevent the Defendants from speaking to anyone with whom Deming has

26   business relations, nor can the Court police every email that is sent for possible wrongful

27   content.

28        While Plaintiffs argue that the Defendants are enacting "vigilante justice" by taking

21

1   assets that may or may not belong to International, it appears that the board of directors

2   of the Delaware corporation attempted to come to an agreement about the assets when

3   the board voted to give Brasberger, Jr. control of these assets.  It is not the Court's place

4   to second-guess that decision and intervene at this early stage in the proceedings just

5   because Deming, the original founder of the company, was outvoted.  Plaintiffs argue

6   that the Delaware corporation never had rights to the assets so therefore could not

7   decide who could control the assets, but the Court cannot make that ownership

8   determination with the limited and conflicting information that has been presented.

9          That said, the Court advises the parties that the current business relationships

10  appear neither sustainable nor advisable.  Even more importantly, this case does not

11  appear to warrant the kind of vociferous litigation the Court has so far witnessed.

12  Accordingly, this matter is STAYED and the parties are ordered to participate in a

13  settlement conference where they should discuss, among other things, dissolution of any

14  remaining corporations and future ownership of the assets of those entities.

15

16                              **CONCLUSION**

17

18         Given the considerations outlined above, Brasberger Defendants' Motion to

19  Quash Service (ECF No. 41) is GRANTED as to Brasberger, Sr. and DENIED as to

20  Brasberger, Jr. and ASHMB.  Default is set aside as to Brasberger, Sr.  Brasberger, Jr.'s

21  and ASHMB's Motion Set Aside Default (ECF No. 41) is DENIED.  Reitmeyer's Motion to

22  Dismiss for Improper Venue, Lack of Personal Jurisdiction, or in the Alternative, Motion

23  to Transfer Venue (ECF No.31) and Plaintiffs' Motion for Preliminary Injunction (ECF No.

24  34) are DENIED.

25  ///

26  ///

27  ///

28  ///

1    On the Court's own motion, this matter is hereby STAYED and referred to the

2  Court's Alternative Dispute Resolution (ADR) Division for scheduling of a Settlement

3  Conference before a magistrate judge.  The scheduling must take place not later than

4  thirty (30) days after this order is electronically filed with written notice of same to be filed

5  with this Court.  The assigned magistrate judge will issue a scheduling order for the

6  Settlement Conference, and counsel are ordered to have a principal with full settlement

7  authority present at the Settlement Conference or to be fully authorized to settle the

8  matter on any terms.  The parties are ordered to file status reports with this Court not

9  later than seven (7) days after the conclusion of the Settlement Conference.

10    IT IS SO ORDERED.

11  Dated:  March 3, 2015

12

13

14  _____
    MORRISON C. ENGLAND, JR, CHIEF JUDGE
15  UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25

26

27

28